**HUSMAN SNACK FOODS COMPANY
and Fireman's Fund Insurance
Company, Appellants,**

v.

**Linda Sue DILLON, Widow of Marvin
Bruce Dillon, Jr., Individually and as
Natural Parent and Guardian for Mar-
vin Bruce Dillon III, and Workmen's
Compensation Board, Appellees.**

Court of Appeals of Kentucky.

Dec. 7, 1979.

Bernard J. Blau, Jolly, Johnson, Blau &
Parry, Newport, for appellants.

Lionel Hawse, Landrum, Patterson &
Dickey, Lexington, for appellees.

Before HAYES, C. J., and LESTER and
WINTERSHEIMER, JJ.

LESTER, Judge.

On April 15, 1976, Marvin Bruce Dillon
was fatally injured in an automobile acci-
dent while attempting to return to his
house in Paris, Kentucky, from the Beverly
Hills Supper Club in Southgate. Dillon
made his living distributing Husman Snack
Foods in the Lexington area. He had gone
to Beverly Hills to attend a sales meeting
sponsored by Husman. The Workmen's
Compensation Board awarded benefits to
Dillon's widow, Linda Sue, on behalf of
herself and her infant child. Husman ap-
peals from the judgment of the Bourbon
Circuit Court that affirmed the decision of
the Board.

Husman denies that it has an obligation to compensate Dillon's dependents under the Workmen's Compensation Act. Husman, in support of this position, maintains that Dillon was an independent contractor not an employee, and that, notwithstanding Dillon's status, he did not die of a work-related injury. We affirm.

Husman manufactures and sells snack foods. In the spring of 1975, Husman began to develop a market in the central Kentucky area. This expansion prompted Husman to hire a District Sales Manager, Tom Abel, and four route salesmen. Husman employed Dillon as one of the route salesmen. Dillon drove a Husman truck and supplied the stores on his route with Husman goods. Husman claims that it hired these route salesmen on the understanding that after a period of time, they would become independent contractors. According to Husman the change in their status occurred on February 11, 1976. Their jobs remained basically the same. They continued to deliver Husman products to the stores that they serviced. However, they did incur greater personal responsibilities and instead of a salary they received a commission. The commission represented a sizeable increase in their income. They could also solicit new customers.

*Ratliff v. Redmon*, Ky., 396 S.W.2d 320 (1965), listed nine factors relevant to the inquiry of whether a claimant should be categorized as an employee or an independent contractor. Husman uses an analysis of each one of these elements in an effort to characterize Dillon as an independent contractor.

Husman asserts that Dillon engaged in the distinct occupation of an independent distributor that involved buying products from Husman and selling these items to retail stores. Husman did not deduct for federal and state taxes from Dillon's check, although it did deduct for social security. Dillon had to file tax returns as a self-employed individual. On cash sales, Dillon deposited the money in a personal bank account prior to remitting the amount to Husman.

Husman urges that Dillon's independent distributor status required some specialized skill. However, Husman has not pointed out what Dillon did differently after his transformation from employee into independent distributor, other than to imply that Dillon would have needed to learn better sales techniques.

Husman contends that Dillon supplied most of the tools of his trade. Husman set up a plan whereby Dillon would eventually purchase the Husman delivery truck. Husman subtracted periodic payments on the truck from Dillon's commission. Record title remained with Husman until Dillon had furnished the entire $2,000 price. Dillon's name appeared on the truck as distributor. Dillon bought the gas and took care of the maintenance. Dillon incurred the cost of insurance which Husman carried on a fleet plan. Dillon procured the license tags. Husman explained that on Dillon's death, it took the truck back without payment, because the damage exceeded Dillon's equity and that Dillon had to absorb the loss for damage to the truck.

Although Husman focuses primarily on Dillon's purported purchase of the truck, it also notes that Dillon made expenditures on other equipment connected with his job. Dillon paid for half the rental of his uniform. His uniform had both Husman's and his name on it. Dillon bore the loss on merchandise that he damaged; but, Husman gave him credit for products damaged through no fault of his own and products that he returned. The parties disputed whether Husman or Dillon bought the two-wheel hand cart. In contrast, Husman did supply order blanks, sales tickets and display racks. Husman also rented the warehouse where Dillon picked up the snack foods.

Husman emphasizes the lack of control and supervision over Dillon. Dillon could work a flexible schedule. His hours depended largely on the time it took to make his rounds as regulated by the preference of the customer stores. Husman contests the finding of the Board that Dillon had to arrive at the warehouse on certain days to

unload the items that he had ordered. However, we believe the Board had an adequate basis for this finding. The evidence shows that more than personal incentive motivated the route salesmen. Mrs. Dillon testified that Tom Abel had phoned for Dillon at home on an occasion when Dillon did not reach the warehouse punctually. Even though Dillon exercised a measure of independence in the performance of his duties, Husman let him know that it was checking his progress. Dillon did not have the freedom of operation of someone who had bought outright goods from the manufacturer for the purposes of resale.

■ Husman points out that it informed Dillon at the outset that his employment would terminate and thàt he would function as an independent distributor. Husman put on proof which indicated that it desired to place Dillon in the posture of an independent contractor. However, an employer cannot by contrivance force an employee to work outside the protection of the Workmen's Compensation Act, even if the employee acquiesces in the employer's terms.

■ The application of the test for distinguishing an independent contractor from an employee favors the employee-employer relationship; also the problems of differentiation would not arise if all the indicators lined up on one side or the other. *Ratliff, supra. Ratliff, supra,* adopted for Workmen's Compensation the method devised in *Restatement (Second) of Agency* § 220 of recognizing the characteristics of an employee for the purposes of vicarious tort liability. *Chambers v. Wooten's IGA Foodliner,* Ky., 436 S.W.2d 265 (1969), refined the test to better serve the objective of workmen's compensation. *Chambers, supra,* at 266 states that the predominant considerations are

> the nature of the work as related to the business generally carried on by the alleged employer, the extent of control exercised by the alleged employer, the professional skill of the alleged employee, and true intentions of the parties.

Larson, in his text *Workmen's Compensation Law* § 43.51 (1978), wrote that the treatment of the claimant's work in relation to the regular business of the employer as the dominant factor in the decision of whether the claimant is an employee, fulfills the theory of risk spreading embodied in compensation. Larson describes the proposition in this fashion:

> The theory of compensation legislation is that the cost of all industrial accidents should be borne by the consumer as a part of the cost of the product. It follows that any worker whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it forms in itself a separate route through which his own costs of industrial accident can be channelled, is within the presumptive area of intended protection. *Larson, Ibid.*

■ The Board found that Husman fixed the prices on all products and ran the specials and sales. Husman suggests, in its brief, that because federal regulations require it and its distributors to adhere to a uniform pricing policy that this marketing factor should not have influenced the Board. But, on the contrary, price control is a relevant consideration. Husman has the ability to structure the prices of its products to include the costs of production. Dillon could not pass the cost of his compensation insurance on to the outlets that he kept supplied with Husman snack foods. Husman had the only opportunity of building into the price of its merchandise the cost of the route salesmen's workmen's compensation. Therefore, when we look to the nature of Dillon's work in relation to the distribution of Husman products, we conclude that this work formed an inseparable part of the regular business of Husman.

Other of the indicia contained in *Chambers, supra,* point to the relationship of Husman and Dillon as one of employer-employee. Husman maintained supervisors who sought out new customers. Sometimes these supervisors would modify the distributor's route to better accommodate existing and new business. The larger accounts

paid Husman directly, not the route salesmen. These factors buttress the Board's decision that Dillon was an employee of Husman within the meaning of the Act.

 Because we agree with the Board that Dillon worked for Husman as a covered employee, we next address the issue of whether Dillon died in a work-related accident. In our opinion, the Board had a sufficient foundation on which to base the finding that Dillon died during the scope of his employment.

Husman arranged the meeting at Beverly Hills so that management could communicate with the people in the sales department and apprise them of promotions and new products. The program followed the format of a cocktail hour, a dinner and a sales meeting. Husman paid for the evening. The agenda of the sales meeting contained admonitions to the route salesmen concerning cooperation with other employees, hard to sell items, a pretzel promotion, and sales motivation.

*Spurgeon v. Blue Diamond Coal Co.*, Ky., 469 S.W.2d 550 (1971), discusses the circumstances that connect a partially social activity to employment. *Spurgeon, supra*, accorded significance to the degree of compulsion the employer exerted on the employee to attend and the benefit the employer derived from the event. Husman notes that it did not require Dillon's presence as a job condition. The Board found that Husman did not force the distributors to come that night, but that Husman did strongly advise attendance. A sufficient evidentiary basis exists for this finding. *Spurgeon, supra*, takes into account the realities of a recommendation by an employer that an employee go to a company affair; an employer does not have to command the employee's appearance. The subject matter of the sales meeting here demonstrates that Husman expected the distributors to be present. Husman organized the function in furtherance of a substantial business purpose. We believe the claimants have established the job relatedness of the meeting at Beverly Hills. Annotation *Workmen's Compensation: Injury Sustained While Attending Employer-Sponsored Social Affair As Arising Out Of And In The Course Of Employment*, 47 A.L.R.3d 566 (1973).

It stands to reason that since Dillon went to Beverly Hills in performance of his duties with Husman, his accident while driving home occurred during the course of a special errand for his employer. The trip to Beverly Hills exposed Dillon to the hazards of the road that he would not have otherwise encountered. The "going and coming rule" does not apply because the travel itself involved a mission for Husman distinct from commuting back and forth to a fixed place of employment. *Spurgeon, supra.*

The judgment is affirmed.

All concur.