RENDERED:  DECEMBER 10, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0942-WC

AIG                                                                                          APPELLANT

v.              PETITION FOR REVIEW OF A DECISION
OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-19-00222

DAOUD OUFAFA; TAXI, LLC D/B/A
TAXI 7 (AKA TAXICAB);
UNINSURED EMPLOYERS' FUND;
HONORABLE W. GREG HARVEY,
ADMINISTRATIVE LAW JUDGE;
AND WORKERS' COMPENSATION
BOARD                                                                               APPELLEES

AND                              NO. 2020-CA-0946-WC

TAXI, LLC D/B/A TAXI 7 (AKA                                      APPELLANT
TAXICAB)

v.              PETITION FOR REVIEW OF A DECISION
OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-19-00222

DAOUD OUFAFA; AIG; UNINSURED
EMPLOYERS' FUND; HONORABLE
W. GREG HARVEY,
ADMINISTRATIVE LAW JUDGE;
AND WORKERS' COMPENSATION
BOARD                                                                    APPELLEES


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; ACREE AND LAMBERT, JUDGES.

ACREE, JUDGE:  Taxi, LLC d/b/a Taxi 7 (Taxi 7) and AIG separately petition

this Court for review of the July 2, 2020, opinion of the Workers' Compensation

Board (the Board) reversing in part, vacating in part, and remanding the decision of

the Administrative Law Judge (the ALJ) and the order dismissing AIG and the

Uninsured Employers' Fund (the UEF) as parties to the claim.  The sole issue on

appeal is whether the Board properly reversed the ALJ's determination that Taxi 7

was a taxicab leasing company rather than a taxicab company that employed

Daoud Oufafa as a driver.  We reverse the Board and remand with instructions to

reinstate the ALJ's determination.

Daoud Oufafa, the claimant before the Board, moved from Morocco

to the United States in 2011.  He is married with two children and has a high

school education.  After working various jobs, including as a vehicle valet, Oufafa

heard from a friend that Taxi 7 was seeking qualified persons to drive its taxicabs.

Taxi 7's business involves leasing taxicabs and related services including dispatch and credit card processing services to individuals, corporations, partnerships, and other entities.[1]  In addition to owning the taxicabs it leases, it owned trademarks, brands, colors, and permits issued by government authority.

Oufafa went to Taxi 7's office and met with its representative, Michael Cregan.  He provided his license to Cregan and later had a drug test performed at Cregan's request.  Cregan then presented Oufafa with two documents to consider.

The first, dated February 5, 2016, was titled "TAXI, LLC COMPANY CAR DRIVER AGREEMENT" and provided that Oufafa would make a weekly lease payment of $405.00, and a separate $30.00 per week payment for vehicle insurance.  Oufafa's lease payments were consideration in exchange for Taxi 7's providing a fully equipped taxicab,[2] dispatch services and credit card processing services, its branding, and its goodwill.  The Agreement also allowed Oufafa to sublease the taxicab and related services with Taxi 7's prior approval.  (Agreement ¶ 1.16.)

---

[1] The form agreement Taxi 7 uses includes provision for leasing to "a corporation, partnership or other legal entity . . . ."  (Agreement, ¶ 9.8.)

[2] Pursuant to the Agreement, the leased taxicab was to be "in good working order, equipped with a taximeter, communication device, camera, credit card processing device and any other equipment as required by any state, county or local ordinance regulating taxicabs."  (Agreement, ¶ 1.3.)

The Agreement required Oufafa to represent and warrant to Taxi 7 that he had "executed a statement which confirms that I am an independent businessperson" and that is the second document Oufafa signed.

Bearing the same date as the Agreement, this document is titled "Status as a Self-Employed Businessperson." It is a one-page document with redundancies that emphasize the nature of the relationship between Oufafa and Taxi 7. The first half of the page says, in pertinent part:

> I acknowledge and agree that there is no employer-employee, principal-agent, or master-servant relationship, either expressed or implied between [Taxi 7] and myself as a result of my operation of my TAXICAB. I am a self-employed businessperson free from interference or control on the part of [Taxi 7] in the manner or means of operation of the TAXICAB or the business that I conduct with the TAXICAB. I shall exercise complete discretion in lawful operation of the TAXICAB, and I shall determine the hours I work, the area I service, the methods, the details and means of performing any and all taxicab services I may decide to provide in my taxicab business, as follows:
>
> ▪ My earnings . . . are mine alone. I shall <u>not</u> share my fares with [Taxi 7], and I shall <u>not</u> account to [Taxi 7] for any fares collected from passengers in the operation of my business. [Taxi 7] shall do no more than make available referrals of prospective passengers received through telephone call service or radio dispatch service.
>
> ▪ [Taxi 7] does not require me (i) to remain at any specified place; (ii) to answer calls or report [my] location . . . ; or (iii) to work any fixed hours. I am free to decide if and when to work . . . and when and if to lease the TAXICAB to others.

- [Taxi 7] does not restrict in any manner . . . [where] I may operate . . . or . . . my use of the TAXICAB for any lawful purpose. Any right to control exists solely with the passenger who is hiring the TAXICAB at my discretion.

- I may market my taxicab business independent of [Taxi 7] and advertise my services in my own name. . . . I may, if I wish, modify the TAXICAB . . . . [Taxi 7] will relay to me orders received . . . from customers specifically requesting my services.

The next part of this "Status" document is in boldface type. Its focus is Oufafa's obligation as an independent business owner to comply with laws:

**I acknowledge and agree that, as a self-employed businessperson, free from authority and control of [Taxi 7]:**

- **I am not an employee for purposes of worker's compensation coverage, State Disability Insurance, the Federal Insurance Contributions Act (FICA), the Social Security Act, and State and Federal tax withholding at the source.**

- **[Taxi 7] will not withhold FICA or state and federal income taxes on any payments I may receive, and I am fully and solely responsible for paying any and all federal and state income taxes and self-employment taxes due as a result of any payments I receive.**

- **It is my responsibility to acquire a business license for the area(s) in which I intend to operate.**

As a further expression of his understanding of his status as a self-employed individual, Oufafa wrote the following in his own handwriting: "I am

-5-

self-employed for all purposes, including workers compensation and unemployment. Whether or not I drive the rented TAXICAB, I am not an employee of company."

Oufafa began driving for Taxi 7 a few days later. On January 5, 2018, while in the process of transporting passengers in his taxicab, Oufafa sustained a gunshot wound to his back that left him paralyzed from the waist down. Oufafa filed an Application for Resolution of Injury Claim seeking benefits for his injuries, alleging that he had been injured in the course and scope of his employment for Taxi 7. After the Department of Workers' Claims certified that Taxi 7 was uninsured, the UEF was joined as a defendant. The UEF denied the claim was compensable. Taxi 7 also denied the claim.

Michael Cregan testified by deposition that he was the general manager for Taxi 7, which had opened in Louisville in August 2015. He had previously worked in another Taxi 7 located in Nashville, Tennessee. The businesses were owned by the same ownership group, NBRS Management Services. Cregan described Taxi 7 and NBRS Management Services as the same entity.

Consistent with the Agreement, Cregan stated that Taxi 7 processed credit card transactions for Oufafa. Any funds were first credited to Oufafa's lease payment, and the remaining funds were wired to Oufafa or stayed in his Taxi 7

account. Taxi 7 issued Oufafa a copy of Internal Revenue Service (IRS) Form 1099K each year stating how much revenue Oufafa generated by his customers' credit and debit card payments. Cregan described the drivers for Taxi 7 as independent contractors.

Based upon Cregan's deposition testimony that Taxi 7 and NBRS Management Services were the same entity, separate counsel entered an appearance for AIG to protect its interests. AIG provided the policy of insurance for ADP Total Source, Inc. (ADP), which was a Professional Employer Organization that provided workers' compensation coverage for the companies falling under its umbrella. ADP's claims were handled by a third-party administrator, Helsman. However, NBRS Management Services, not Taxi 7, was included in the endorsement for covered companies under ADP's policy with AIG. The ALJ conducted a teleconference with the parties to discuss the newly raised issues. The ALJ treated AIG's motion as a motion to intervene, which was granted for the purpose of determining the coverage question – whether Taxi 7 was insured or was the beneficiary of workers' compensation coverage for Oufafa's injuries. The ALJ also reopened proof to allow the parties to submit evidence on the question of whether coverage existed. AIG subsequently entered a denial of Oufafa's claim.

Michael Solomon testified by telephonic deposition. He was the President of NBRS Management Services, which he described as providing employees for the management of its group of taxicab companies throughout the eastern part of the United States. NBRS Management Services had workers' compensation insurance with ADP. Cregan was an employee of NBRS Management Services and worked as the manager of Taxi 7 on-site in Louisville. He was not an employee of Taxi 7; rather, that was the location where he worked as Taxi 7 did not have any employees.

Solomon testified that he considered himself to be an expert in the area of taxi companies and explained how they are typically set up:

> I would say 99.9 percent of all taxi cab companies in the U.S. are operated on an independent contractor basis where the drivers secure or bring their own vehicle and they are several models one or the other to the taxi company [sic]. They pay for the opportunity to work under their what they call their colors, their brands. They are independent contractors. What they collect in the vehicle belongs to them. They pay a fee either by week or by month or by day or by shift. There's a multitude of ways that works. In our case our drivers pay by week as a courtesy but they're signing a month-long contract that auto renews if either party doesn't make a change to that before the end of the month. There is a small handful of companies including the City of Las Vegas that the drivers are actually employees of the company but, like I say, 99 percent of all their jurisdictions in the U.S. is done the way as I previously stated as independent contractors renting a car or bringing their own car and renting our services, our dispatch, our brands, our permits, and that's pretty much the way they operate.

Because Taxi 7 did not have any employees, Solomon stated that it did not require workers' compensation coverage. Later, Solomon testified that NBRS USA Holdings owned Taxi 7, not NBRS Management Services, and that NBRS Management Services and Taxi 7 were not the same company. He described Oufafa as a customer of Taxi 7 and an independent contractor. Solomon pointed out that Oufafa filled out paperwork that stated he was an independent contractor and Taxi 7 filed Form 1099K with the IRS stating independent contractor earnings for Oufafa. He did agree that the drivers were an integral part of the business.

The ALJ held a benefit review conference on December 2, 2018, and entered an order thereafter indicating that the matter had been bifurcated to first determine the contested issues of whether Oufafa had an employment relationship with Taxi 7 and, if so, whether there was coverage for his claim. A final hearing was held immediately after the conference.

At the hearing, the ALJ heard additional testimony from Oufafa and Cregan. Oufafa testified that he gave his tax records to a tax "officer" to complete and file his tax forms. Cregan also testified he did not understand anything about the U.S. tax law. He stated that he was an employee of NBRS Management Services where he worked as the general manager over day-to-day operations at Taxi 7. He described the company as a taxi company that leases vehicles. He said he managed Taxi 7's leasing operations. Cregan said it was a standard practice in

-9-

Louisville for taxi companies to lease cabs to independent contractors, who then operated as a business. He also testified that the City of Louisville sets the maximum taxi rate as well as how the taxis are to operate and look. The only requirements to drive with Taxi 7 are a driver's license, a background check, a drug test, and a permit from the City of Louisville. Taxi 7 held the certificate of operation. By the time of the hearing, Cregan stated that Taxi 7 had merged with Yellow Cab.

The parties filed briefs addressing the salient issues, after which the ALJ entered an opinion and order on January 31, 2020, in which he determined that Oufafa was an independent contractor. Pertinent to the issue before this Court, the ALJ made several findings. First, the ALJ addressed the nature of Oufafa's work as it related to Taxi 7's business:

> Taxi 7 leased the taxicab and equipment to Oufafa. It also provid[ed] the certificate of operation that allowed Oufafa to drive a cab and the dispatch service that notified Oufafa of the overwhelming majority of potential customers in the city. However, Oufafa did not work a set schedule and could accept or reject pick-[ups] as he saw fit. In fact, he could park the cab for as long as he wanted provided he paid the lease as it came due. [Taxi 7] alleges it is a taxicab leasing company whose customer is the driver. It submits the driver's customer is the passenger.

> As a regulated industry, the city of Louisville also exercised control over the appearance of the cab, did routine inspections and required Oufafa to be permitted to drive. Taxi 7 did not actually transport people, it provided Oufafa the means to do so. The ALJ agrees with

Solomon's testimony that the structure of the business is driven by costs considerations on both sides – both from the owner of the cabs and the driver. Each has reasons to desire the relationship to be other than that of employee-employer.

The obvious cost driver for the owner of the cab fleet is worker's compensation insurance. By setting up a relationship that is that of independent contractor with the drivers, the owner of the vehicles and certificate enables itself to generate revenue through lease payments rather than direct fare-splitting. It also does not have employees. Similarly, the driver retains the autonomy of setting his own schedule, avoiding withholdings, working in areas and at times he desires and to have some control over the amount of fares he generates with a set cost of the cab. In other words, once the driver has the lease payment covered, all the earnings over and above that amount are his and his alone.

In the absence of drivers, a taxi leasing company would have no market for leasing the cabs it owns and outfits. Consistent with Solomon's testimony, the ALJ finds Oufafa's work as a taxi cab driver was an integral part of Taxi LLC's business of leasing cabs to operators and this factor weighs in favor of an employer/employee relationship.

Next, the ALJ addressed the extent of control exercised over Oufafa by Taxi 7:

The fact that Oufafa retained autonomy in his schedule, had the ability [to] accept and reject any dispatch calls causes the ALJ to find that Taxi 7 did not exercise significant control over . . . Oufafa. The ALJ is aware there is a distinction between the right to control and the extent of control. Once Oufafa decided to enter into the lease, Taxi 7 did not have the right to control his every day

-11-

work and did not do so. It did have the right to control the equipment it owned and to monitor [its] use.

The ALJ found this factor weighed in favor of finding that Oufafa was an independent contractor.

Later, the ALJ addressed whether Oufafa was engaged in a distinct occupation or business:

This issue is very closely aligned with the analysis above. Defendant argues that it was in the business of leasing cabs while [Oufafa] was in the business of transporting customers. Unlike the integral part of the business analysis performed above, the question of whether or not Oufafa's work was distinct is different. He drove a cab. The alleged employer is Taxi 7 who provides the capital equipment, certificate of operation and dispatch services. It does not also transport passengers. It leases vehicles and provides information but does not drive. Oufafa is in the business of driving passengers. He could perform that work for Uber or Lyft or for another cab company. His work is distinct from leasing cabs and performing dispatch services.

The undersigned is persuaded Oufafa was engaged in a distinct occupation or business as a cab driver. Although that business is an integral part of Taxi 7's business of leasing taxi cabs it is still distinct.

The ALJ believes Oufafa was engaged in a distinct occupation or business but that his work was an integral part of Taxi 7's business. Because his work was distinct, this factor supports a finding Oufafa was an independent contractor.

After completing his analysis of the factors, the ALJ concluded:

-12-

As the parties can see from the above analysis, this claim presents a very difficult set of facts and law. The ALJ has evaluated the factors required by the Courts in both [*Ratliff v. Redmon*, 396 S.W.2d 320 (Ky. 1965),] and [*Chambers v. Wooten's IGA Foodliner*, 436 S.W.2d 265 (Ky. 1969).] The predominant factors are split. The remaining *Ratliff* factors weigh slightly in favor of a finding of independent contractor. This is a unique situation where Oufafa's employment is an integral part of Taxi 7's business but he plays a distinct role. The Taxi 7 business model is that of a leasing company. It has priced the lease of the cabs and allowed the driver to make whatever profit he can. It has also left the amount of work and schedule up to the driver.

. . . .

Taxi 7 leased the cab and Oufafa was the driver. Oufafa paid Taxi 7 the lease amounts while the city dictated the maximum fare Oufafa could charge. Taxi 7 had no way, in this particular relationship, to pass on the costs of the injuries to passengers in Oufafa's cab. This is not a situation where a product is being sold. This is a service provided by Oufafa with capital equipment provided by Taxi 7.

This is a claim where great empathy exists for Oufafa's plight. The undersigned is obligated, however, to apply the law to the facts presented. In doing so, the ALJ finds the factors evaluated lead to the finding that Oufafa was an independent contractor. He signed an agreement to drive a cab as an independent contractor and did so for approximately three years. His tax returns reflect he identified himself as a self-employed taxicab driver. Taxi 7 provided him with a cab and services to help him procure passengers. It did not control his day to day work activities and he had autonomy.

-13-

Accordingly, the ALJ dismissed the claim against Taxi 7 based upon its finding that Oufafa was an independent contractor and deemed the remaining issues to be moot.

AIG filed a petition for reconsideration seeking clarification that it and the UEF were also dismissed from the claim, which the ALJ granted by order entered February 21, 2020. The opinion and order was amended to reflect that AIG and the UEF were both dismissed.

Oufafa also filed a petition for reconsideration, in which he pointed out numerous errors of fact and law. This included an argument that Taxi 7 was not merely a taxicab leasing company based upon its representations that it was a taxi transportation service when it obtained the certification of operation from the City of Louisville. The ALJ rejected this argument, noting that he had focused on the conduct of the parties with each other. The ALJ ultimately denied Oufafa's petition.

Oufafa appealed the ALJ's decisions to the Board, which entered its opinion on July 2, 2020. The Board ruled that the ALJ incorrectly concluded that Taxi 7 was a taxicab leasing company rather than a taxicab company and that this "tainted the entirety of his analysis." The Board continued:

> Unquestionably, a proper understanding of the nature of the alleged employer's regular business is essential before undertaking an analysis under *Ratliff*, *Chambers*, and [*Kelly Mountain Lumber v. Meade*, Nos. 2007-SC-

000507-WC and 2007-SC-000526-WC, 2008 WL 3890701 (Ky. Aug. 21, 2008).] As we previously pointed out, the Court in [*Husman Snack Foods v. Dillon*, 591 S.W.2d 701 (Ky. App. 1979),] stated, "the treatment of the claimant's work in relation to the regular business of the employer as the dominant factor in the decision of whether the claimant is an employee, fulfills the theory of risk spreading embodied in compensation." *Dillon* at 703. (Emphasis added). In other words, before the ALJ can accurately determine if his delineation of a worker as an "employee" or "independent contractor" satisfies the theory of risk spreading which is essential to the workers' compensation system, he must have an accurate understanding of the claimant's work in relation to the regular business of the employer.

The Board held that the evidence from both Cregan and Solomon compelled a finding that Taxi 7 was a taxicab company, not a taxi leasing company.

Accordingly, the Board reversed the ALJ's determination that Taxi 7 was a taxicab leasing company, vacated his finding that Oufafa was an independent contractor and the order dismissing AIG and the UEF as parties, and remanded the claim to the ALJ for "an amended opinion finding Taxi 7 is a taxicab company" along with a renewed analysis of the factors set forth in *Ratliff*, *Chambers*, and *Meade*. The Board directed the ALJ to "look to the nature of the work Oufafa performed in relation to the regular business of Taxi 7 as a taxicab company" when he re-analyzed the control factor.

Finally, the Board addressed what weight should be given to the language in the Agreement and the Status as a Self-Employed Businessperson

document. The Board disagreed with the ALJ's finding that these documents manifested the intent of the parties, stating that "depending on the facts of the given case, a claimant labeled by an employer as an independent contractor in a contract of hire may, in reality, be no more 'independent' than any other at-will employee in Kentucky." These consolidated petitions for review by AIG and Taxi 7 (collectively, the appellants) now follow.

On appeal, Taxi 7 argues that the Board erroneously made its own findings of fact and in doing so usurped the function of the ALJ, that the ALJ's finding that Taxi 7 leases taxicabs is supported by substantial evidence or was harmless error, and that the Board's direction on remand related to the control factor was contrary to the law. AIG argues that the evidence presented to the ALJ does not compel a finding in Oufafa's favor by the Board and that the Board improperly substituted its judgment for that of the ALJ.

This Court's standard of review in workers' compensation appeals is well-settled in the Commonwealth. "The function of further review of the [Board] in the Court of Appeals is to correct the Board only where the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *Western Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992). As to the Board's review, Kentucky Revised Statute (KRS) 342.285(2) provides:

-16-

No new or additional evidence may be introduced before the board except as to the fraud or misconduct of some person engaged in the administration of this chapter and affecting the order, ruling, or award, but the board shall otherwise hear the appeal upon the record as certified by the administrative law judge and shall dispose of the appeal in summary manner. The board shall not substitute its judgment for that of the administrative law judge as to the weight of evidence on questions of fact, its review being limited to determining whether or not:

> (a) The administrative law judge acted without or in excess of his powers;
>
> (b) The order, decision, or award was procured by fraud;
>
> (c) The order, decision, or award is not in conformity to the provisions of this chapter;
>
> (d) The order, decision, or award is clearly erroneous on the basis of the reliable, probative, and material evidence contained in the whole record; or
>
> (e) The order, decision, or award is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

In Kentucky, "[t]he claimant in a workman's compensation case has the burden of proof and the risk of persuading the board in his favor." *Snawder v. Stice*, 576 S.W.2d 276, 279 (Ky. App. 1979) (citations omitted). "When the decision of the fact-finder favors the person with the burden of proof, his only burden on appeal is to show that there was some evidence of substance to support

the finding, meaning evidence which would permit a fact-finder to reasonably find as it did." *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986). However, "[i]f the board finds against a claimant who had the burden of proof and the risk of persuasion, the court upon review is confined to determining whether or not the total evidence was so strong as to compel a finding in claimant's favor." *Snawder*, 576 S.W.2d at 280 (citations omitted). The *Francis* Court went on to explain:

> If the fact-finder finds against the person with the burden of proof, his burden on appeal is infinitely greater. It is of no avail in such a case to show that there was some evidence of substance which would have justified a finding in his favor. He must show that the evidence was such that the finding against him was unreasonable because the finding cannot be labeled "clearly erroneous" if it reasonably could have been made.
>
> Thus, we have simply defined the term "clearly erroneous" in cases where the finding is against the person with the burden of proof. We hold that a finding which can reasonably be made is, perforce, not clearly erroneous. A finding which is unreasonable under the evidence presented is "clearly erroneous" and, perforce, would "compel" a different finding.

708 S.W.2d at 643. Furthermore, "[t]he ALJ, as the finder of fact, and not the reviewing court, has the sole authority to determine the quality, character, and substance of the evidence." *Square D Co. v. Tipton*, 862 S.W.2d 308, 309 (Ky. 1993) (citing *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418 (Ky. 1985)).

We disagree with the Board that the evidence of record compels a finding for Oufafa that Taxi 7 was a taxicab company that employed him.

However, we agree with the Board's emphasis on "the intertwined association between an analysis of the control factor and an analysis of the nature of the claimant's work in relation to the regular business of the employer." The Board instructed the ALJ to "look to the nature of the work Oufafa performed in relation to the regular business of Taxi 7" and, consistent with *Meade*, *supra*, directed "the control factor to be analyzed by looking to the nature of the work that the injured worker performed in relation to the regular business of the employer." *Meade*, 2008 WL 3890701, at *4. This record allows the Court to do that without the ALJ's input.

The Board identifies "the claimant's **work** in relation to the regular business of the employer as the dominant factor in the decision of whether the claimant is an employee . . . ." *Dillon*, 591 S.W.2d at 703 (emphasis added). But what do we mean by "work"?

"'Work' means providing services to another **in return for remuneration** on a regular and sustained basis in a competitive economy[.]" KRS 342.0011(34) (emphasis added). According to this record, Taxi 7 did not remunerate Oufafa at all. He received remuneration from one source–his independent customers. What Oufafa charged was a matter negotiated between Oufafa and his customers, provided the fare satisfied the applicable regulatory

-19-

authority–Taxi 7 had no say, and no stake in what Oufafa charged or received as remuneration.

To be clear, Oufafa received remuneration two ways. He was paid directly from his customers when they paid in cash. When a customer paid by debit or credit card, Taxi 7 processed the payment as part of the leasing services Oufafa purchased with his weekly $405 payment. Taxi 7 never supplemented any of Oufafa's customers' credit or debit card payments, nor did Taxi 7 add to Oufafa's income in any way. To the contrary, Taxi 7 sometimes retained a portion of Oufafa's customers' debit and credit card payments to apply against his weekly lease payment.

The IRS Form 1099K Taxi 7 provided to Oufafa is not proof of remuneration by an employer to an employee. The form, entitled "Payment Card and Third[-]Party Network Transactions," is required for compliance with 26 United States Code Annotated (U.S.C.A.) § 6050W. That statute requires a "payment settlement entity"–Taxi 7 in this case–to report to the Internal Revenue Service "any payment card transaction and any third[-]party network transaction" made to "each participating payee to whom one or more payments in settlement of reportable payment transactions are made" and, in this case, that "participating payee" would be Oufafa. 26 U.S.C.A. § 6050W(a)-(d). When Oufafa received his copy of the Form 1099K that Taxi 7 sent to the IRS, he was required by law to

-20-

report the same amount on his federal income tax return. And, in fact, he did so using a Schedule C (Form 1040), "Profit and Loss From Business (Sole Proprietorship)." (Oufafa brief, Appendix G.) The Form 1099K is evidence that Taxi 7 was a payment settlement entity, but not proof Taxi 7 was Oufafa's employer.

Oufafa never performed "work" for Taxi 7 as that term is defined in KRS Chapter 342. Remuneration by the employer, a primary characteristic of the relation between an employee and an employer, simply cannot be found in the relationship between Oufafa's work and the regular business of Taxi 7. We reach the same conclusion if we shift our focus to the other side of that relationship, the regular business of Taxi 7.

Taxi 7 derives its revenue by leasing equipment and services for a set weekly fee. Its income is unaffected by how much or how little its lessees work. To rephrase that concept, Taxi 7's income is not generated by the labor performed by taxicab drivers, but by how many lease contracts it services. That is a proper understanding of this alleged employer's regular business. It does not support a finding that Taxi 7 was Oufafa's employer.

The independency of Oufafa's business and Taxi 7's business is not lessened because there is an interrelationship. We even agree with the Board's premise that "an independent contractor in a contract of hire may, in reality, be no

more 'independent' than any other at-will employee in Kentucky." However, this record does not contain evidence supporting that premise to such a degree as to compel a finding of an employee-employer relationship. That is not to say no evidence exists. But if we were to unbundle what Taxi 7 leases, separating credit card processing services from vehicle leasing for example, we could easily see that the former is ubiquitous in the retail industry and the latter available at every airport without even a thought that an employee-employer relationship is involved.

The Agreement and Status document between the parties has some bearing on the foregoing analysis of Oufafa's remuneration. The Board's instruction to the ALJ on remand that less weight should be afforded those documents would not have yielded an analysis that compelled a finding for Oufafa on the question of his employment status. The documents do tell us that Oufafa understood his relationship with Taxi 7 and that these documents informed him of his obligation to comply with the law applicable to independent contractors.

The bottom line for this Court is that Oufafa controlled his own compensation. If he chose not to work, it would lower his income while also reducing the risk that he would suffer a workplace injury. That he should bear these associated risks is in keeping with the "theory of risk spreading embodied in compensation." *Dillon*, 591 S.W.2d at 703.

We are not unsympathetic to Oufafa's circumstances. We can all agree he is a victim. But we must repeat the ALJ's sentiment that "[a]lthough it gives the undersigned no pleasure to do so[,] the analysis dictates the result and Oufafa's claim for benefits" must fail.

CLAYTON, CHIEF JUDGE, CONCURS.

LAMBERT, JUDGE, DISSENTS AND DOES NOT FILE SEPARATE OPINION.

BRIEF FOR APPELLANT/APPELLEE AIG:

Ronald J. Pohl
Carolyn A. Allen
Lexington, Kentucky

BRIEF FOR APPELLANT/APPELLEE TAXI, LLC D/B/A TAXI 7:

Kyle L. Johnson
Louisville, Kentucky

BRIEF FOR APPELLEE DAOUD OUFAFA:

Andrew C. Weeks
Louisville, Kentucky