RENDERED: FEBRUARY 16, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0003-WC

DAOUD OUFAFA                                                          APPELLANT


ON APPEAL FROM COURT OF APPEALS
V.            NOS. 2020-CA-0942 & 2020-CA-0946
WORKERS' COMPENSATION BOARD NO. 19-WC-00222


TAXI, LLC D/B/A TAXI 7 (AKA TAXICAB);                                 APPELLEES
AIG; COMMONWEALTH OF KENTUCKY EX
REL. DANIEL J. CAMERON, ATTORNEY
GENERAL; W. GREG HARVEY;
UNINSURED EMPLOYERS' FUND; AND
WORKERS' COMPENSATION BOARD


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>REVERSING AND REMANDING</u>**

Appellant, Daoud Oufafa was working as a Taxi 7 driver when he was shot in the shoulder, causing permanent damage. Oufafa was denied workers' compensation benefits by Taxi 7 on the grounds that he was an independent contractor, not an employee. An ALJ determined that Taxi 7 was correct to deny Oufafa benefits. The Workers' Compensation Board reversed and remanded, however, concluding that the ALJ was clearly erroneous in his findings. The Court of Appeals reversed the Board and determined under its own analysis that Oufafa was an independent contractor, as the ALJ had determined. Oufafa appeals the decision of the Court of Appeals to this Court.

For the reasons stated herein, the order of the ALJ is vacated and the case is remanded back to the ALJ pursuant to this Opinion.

## I. BACKGROUND

Daoud Oufafa moved from Morocco to the United States in 2011. He has a high school education, two young children, and a wife. After moving to the United States, he worked several jobs doing unskilled labor. In 2016, Oufafa sought to work for Taxi 7, a business seeking drivers for its taxicabs. Taxi 7 is insured though AIG. Oufafa went to the Louisville Taxi 7 office and met with the office's head, Michael Cregan. Oufafa showed Cregan his license and provided him with his résumé and a background check. Cregan requested Oufafa take a drug test. After these requirements were satisfied, Cregan gave Oufafa two documents to fill out to start working for Taxi 7. Oufafa filled out the required documents and began driving for Taxi 7.

Taxi 7 generates revenue by leasing taxis to its drivers.[1] Taxi 7 identifies its drivers as independent contractors. The documents provided to Oufafa included a section in which he, in agreeing to work for Taxi 7, also agreed that for the purposes of workers' compensation, he was not an employee. This section must be hand-written by the signer, and Oufafa did hand-write the section. He testified that he nonetheless did not understand to what he was agreeing.

---

[1] Although the ALJ found that the only money Taxi 7 made was through leasing taxis, there is some conflicting deposition testimony regarding whether Taxi 7 or its parent company make money from the processing fee on credit card payment for rides.

Despite this, Taxi 7 operates as a hub for business for its drivers, who may use their leased cabs only for Taxi 7 rides. Taxi 7 operates the dispatch system for the taxicab drivers using their taxis. When a dispatch comes to a driver for a requested ride, the driver only has access to a zone number associated with a general area in Jefferson County. Once a driver accepts a ride, he or she is provided with a specific address and passenger identity for that ride. If the driver then decides to reject the ride, their account is locked for 15 to 30 minutes, and they may accept no new rides through the dispatch service in that time.[2] If a driver repeatedly declines drives, they are reprimanded by Taxi 7, and some are fired.

Oufafa testified at a hearing before the ALJ that 90–95% of his rides came through Taxi 7's dispatch service. The remainder came from customers he picked up on the sidewalks who waved him down for a ride. Any time a customer complained, that complaint was made to Cregan who would address it with the driver. Customers could pay either with a credit card (for which the payment would go through Taxi 7's processing system) or directly to the driver (through cash or digital vendors, such as Venmo, Cashapp, etc.).

On the morning of January 5, 2018, at 5:00 A.M., Oufafa received a dispatch requesting a ride. Oufafa accepted, and when he arrived, the customer asked Oufafa to take him to the Newburg area of Louisville. When they arrived, the customer then asked Oufafa to take him to Iroquois Park.

---

[2] While this seems to be disputed later, the depositions of both Cregan and Oufafa support this fact.

Oufafa told the customer that he needed to finish and pay for the current ride before proceeding on a second ride. When the customer replied he only had a $100 bill, Oufafa suggested that the customer hand him the bill, and Oufafa would give him change upon arriving at the second location. The customer became angry, pulled a gun, and demanded all of Oufafa's cash. Oufafa complied. The customer hit Oufafa in the shoulder, and the gun discharged. Oufafa was shot in the shoulder. As a result, Oufafa is permanently paralyzed from the waist down.

Following the injury, Oufafa required extensive medical care. He testified that he would require lifelong physical therapy and care due to his disability. To pay for this, Oufafa sought workers' compensation. Taxi 7 denied his claim due to his status as an independent contractor rather than an employee. Oufafa challenged that ruling, asserting to the Department of Workers' Claims that he was an employee of Taxi 7, not an independent contractor, despite the language in his contract. If Oufafa was an employee, then his medical expenses could be covered.

After a hearing on the matter, an ALJ determined that Oufafa was an independent contractor. In coming to that conclusion, the ALJ pieced together a test from *Ratliff v. Redmon*, 396 S.W.2d 320 (Ky. 1965) (outlining a nine-factor test for employee/independent contractor determinations), and *Chambers v. Wooten's IGA Foodliner*, 436 S.W.2d 265, 266 (Ky. 1969) (holding that four of the *Ratliff* factors are most important to an independent contractor/employee determination). The test implemented by the ALJ was

4

comprised of four primary factors and six supplemental factors to determine whether Oufafa was an employee. Pursuant to *Chambers*, the four primary factors the ALJ considered were:

1. The nature of the work as it relates to the business of the alleged employer,

2. Extent of control exercised by the alleged employer,

3. Degree of professional skill the work requires, and

4. Intent of the parties.

The ALJ found that the four primary factors were split, two to two in favor of each outcome. He thus proceeded to analyze six other factors. The six factors that the ALJ considered pursuant to *Ratliff* were:

1. Whether the worker is engaged in a distinct occupation or business,

2. Whether the type of work is usually done in the locality under the supervision of an employer or by a specialist, without supervision,

3. Whether the worker or the alleged employer supplies the instrumentalities, tools, and place of work,

4. Length of employment,

5. Method of payment, whether by the time or job, and

6. Whether the work is a part of the regular business of the alleged employer.

The ALJ acknowledged that the sixth factor was, in essence, the same inquiry as the first of the *Chambers* factors. In the course of analyzing the ten total

factors, the ALJ found that Taxi 7 was a taxi *leasing* company as opposed to a taxicab company; this factual finding affected his analysis of several of the *Chambers/Ratliff* factors. After his analysis, the ALJ wrote: "The predominant factors are split. The remaining *Ratliff* factors weigh slightly in favor of a finding of independent contractor." Accordingly, and with great sympathy, the ALJ denied benefits to Oufafa. After the order was entered, the ALJ amended it to reflect that AIG was dismissed as a party to the case.

On appeal, the Workers' Compensation Board reversed the ALJ, concluding that the ALJ's finding that Taxi 7 was a taxi leasing company was "clearly erroneous." The Board found that Taxi 7 was a taxicab company (as opposed to a taxicab leasing company), and that this finding was inextricably linked to the entire analysis regarding Oufafa's employment status. The Board ultimately remanded to the ALJ to analyze Oufafa's role again in light of their reversal of that factual finding. The Board also ordered that the ALJ "look to the nature of the work Oufafa performed in relation to the regular business of Taxi 7 as a taxicab company" when he analyzed the control factor specifically. Further, the Board concluded that the ALJ erred by finding that the parties manifested their intent in the contracts signed, stating, "depending on the factors of the given case, a claimant labeled by an employer as an independent contractor in a contract of hire may, in reality, be no more 'independent' than any other at-will employee in Kentucky." Taxi 7 appealed the Board's decision.

The Court of Appeals reversed the Board in a split decision. The Court of Appeals reinstated the ALJ's opinion, holding that because Taxi 7's primary

6

source of revenue was through leasing taxis to drivers, it was reasonable for the ALJ to conclude that Taxi 7 was a taxi leasing company. The Court of Appeals went further, however, holding on its own that Oufafa was an independent contractor rather than an employee. It did so by relying on the definition of "work" as tied directly to renumeration, holding that Oufafa "never performed 'work' for Taxi 7 as that term is defined in KRS Chapter 342." The Court of Appeals went on to write that "[Taxi 7's] income is unaffected by how much or how little its lessees work," which "does not support a finding that Taxi 7 was Oufafa's employer."

In its analysis, the Court of Appeals did not use the *Chambers/Ratliff* factors. Holding that Oufafa was an independent contractor, the Court of Appeals wrote, "The bottom line for this Court is that Oufafa controlled his own compensation . . . . That he should bear these associated risks is in keeping with the 'theory of risk spreading embodied in compensation.'" One judge dissented without opinion. Oufafa appealed the Court of Appeals decision to this Court. Following the appeal, this Court ordered that the parties submit supplemental briefs regarding whether this Court's adoption of the economic realities test in *Mouanda v. Jani-King International*, 653 S.W.3d 65 (Ky. 2022) should affect this Court's assessment of the case at bar.

## II. ANALYSIS

Oufafa argues to this Court that the Court of Appeals erred in reversing the Board. Oufafa claims that the Board was correct in its conclusion that the ALJ's finding that Taxi 7 is a taxi leasing company was clearly erroneous.

7

Oufafa further argues that the Court of Appeals should not have undertaken its own analysis of Oufafa's employment status, and that even if it could have, the analysis was incorrect. Additionally, Oufafa argues that this Court should adopt the economic realities test in workers' compensation cases and determine under that test that Oufafa is an employee. Oufafa argues in the alternative that this Court should adopt the economic realities test and remand with instructions that the ALJ both implement the economic realities test, as well as follow the instructions from the Board in its order for remand.

Taxi 7 argues, by contrast, that the ALJ's taxi-leasing-company finding was supported by substantial evidence, and that the ALJ's opinion should be reinstated. Taxi 7 also argues that the Court of Appeals correctly determined that Oufafa was an independent contractor. Taxi 7 additionally claims that the Board's direction to the ALJ about the weight to be given to the contract between Oufafa and Taxi 7 in analyzing the intent of the parties was not properly before either the Board or the Court of Appeals. Regarding the economic realities test, Taxi 7 argues against using it in the workers' compensation context. However, Taxi 7 maintains that even under that test, we should affirm the Court of Appeals' holding that Oufafa is an independent contractor.

AIG, still a party to this case on appeal, argues consistently with Taxi 7 on the merits of the case at bar. It argues additionally, however, that if this Court remands back to the ALJ, then AIG should not be a party to the suit given its earlier dismissal.

8

This Court's review of the Court of Appeals is constrained by our standard of review.

> In workers' compensation cases, this Court's standard of review depends upon whether the issue on appeal is a question of law or fact. In reviewing an ALJ's decision on a question of law or interpretation and application of a law to the facts at hand, our standard of review is de novo. With regard to questions of fact, "[t]he ALJ as fact finder has the sole authority to judge the weight, credibility, substance, and inferences to be drawn from the evidence."

*Apple Valley Sanitation, Inc. v. Stambaugh*, 645 S.W.3d 434, 438 (Ky. 2022). Below, the Board and Court of Appeals reviewed for issues of fact. However, these reviewing bodies operated under the auspices of the *Ratliff/Chambers* framework, as well as the definition of "work," in their reviews. The approaches used by the ALJ, Board, and Court of Appeals are wrought with difficulty in application. In cases such as Oufafa's, a worker's status as an employee comes to a splitting of hairs or conjecture. In order to bring more clarity to this area of the law, we hereby adopt the economic realities test to determine whether a worker is an employee or independent contractor for the purposes of workers' compensation.

The ALJ's searching and thorough analysis is an excellent example of the haggard state of the law. First, the ALJ analyzed the *Chambers* factors. Then, with an evenly split set, the ALJ looked to six of the *Ratliff* factors. The analysis was a multi-level attempt to decipher the *reality* of the relationship between Oufafa and Taxi 7. The Court of Appeals, by contrast, attempted to classify Oufafa by relying solely on the statutory definition of "work."

9

Neither the Court of Appeals' approach nor the *Ratliff/Chambers* factors adequately capture the reality of Oufafa's working relationship. The ALJ himself recognized the apparent difficulty with applying these factors to this case: "Although it gives the undersigned no pleasure to do so[,] the analysis dictates the result[.]" The ALJ's analysis under the factors was encumbered by a weighty reliance given to the documents outlining the contractual relationship between the parties. Although the ALJ in this case did not go so far, relying too heavily on documentation alone cuts against the true inquiry at hand: regardless of the attempts of an employer to tie a worker's hands with paper, what is the nature of their employment relationship? If this were not the basic inquiry, then independent contractor/employee questions would always come down to the words on a page, regardless of how employers operate their businesses. The likelihood of abuse is high under such a test.

Apparently sympathetic to the difficulty of untangling the *Ratliffe/Chambers* factors, the Court of Appeals attempted to determine the true nature of Oufafa's employment with *no* reference to the factors. Instead, that court looked to a basic definition of "work" under KRS 342.0011(34).[3] Although the use of KRS 342.0011(34) may have provided some insight into the nature of the employment relationship at issue, it also ignored other glaring, relevant facts (including, for example, the level of control held by an employer over a worker). Using KRS 342.0011(34) alone is clearly an untenable solution.

---

[3] This shift in analytical framework alone evinces the need for clarification in the law. Our fact-finding and reviewing bodies must rely on the same premises.

At the time of this case's consideration, there are currently two different tests in Kentucky for determining whether a worker is an independent contractor or an employee. Using different tests—although consistent, as discussed below—could lead to outcomes in which under workers' compensation, workers are legally considered independent contractors, while for the purposes of wage and hour laws, they are employees. This offends common sense. If we adopt the Court of Appeals' approach, even more diverse outcomes are risked. In this instance, the law demands consistency within itself and reliable outcomes. Extending our use of the economic realities test achieves these goal (both for workers' rights broadly, and among the lower courts).

Considering the economic realities test in the context of workers' compensation is not novel. This Court first entertained the possibility of adopting the economic realities test for workers' compensation claims in *Purchase Transportation Services v. Estate of Wilson*, 39 S.W.3d 816, 819 (Ky. 2001). In *Purchase Transportation Services*, the estate of Wilson, a deceased taxi driver, sought workers' compensation benefits after she was murdered while driving her taxi. *Id.* at 816–17. In that case, under the *Ratliff* factors, this Court affirmed the ALJ's finding that Wilson was an employee, not an independent contractor. *Id.* at 819. This Court's mention of the economic realities test was only cursory: "Radio Cab argues that when determining a worker's status as an employee or independent contractor under the Fair Labor Standards Act of 1966, other jurisdictions apply an 'economic reality' test

11

which differs from that set forth in *Ratliff v. Redmon, supra.*" *Id.*[4] Despite

mentioning the test, this Court did not then adopt it—though it did not

foreclose the test's future adoption, either. The Court simply held that the ALJ

"conducted a proper" analysis without further discussing the proposed

economic realities test. *Id.* Since that case's rendering, however, this Court *has*

adopted the economic realities test to determine independent contractor or

employee status (albeit outside of the workers' compensation context).

Oufafa's case presents the first opportunity since our Opinion in

*Mouanda* for this Court to reconcile the apparent conflict in our interpretation

of the same terms across different (though related) labor laws. *Mouanda,* 653

S.W.3d 65. In *Mouanda,* this Court adopted the economic realities test to

determine the difference between employees and independent contractors in

the context of the Kentucky Wage and Hour Act (KWHA). That test has six

factors:

1. The permanency of the relationship between the parties,

2. The degree of skill required for the rendering of the services,

3. The worker's investment in equipment or materials for the task,

4. The worker's opportunity for profit or loss, depending upon his skill,

---

[4] Interestingly, although the facts underlying both *Purchase Transportation Services* and the case at bar are remarkably similar, the taxi companies in each case harbor different opinions regarding whether the economic realities test should be implemented in workers' compensation cases and to what effect. The notable distinction between the cases seems to be whether the ALJ initially found in the respective companies' favor or not under the *Ratliff* test.

12

5. The degree of the alleged employer's right to control the manner in which the work is performed, and

6. Whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 74. These factors are consistent with this Court's delineated factors in *Ratliff. Id.* at 75. In fact, the tests share five factors. *Id.* The fundamental inquiry in both *Ratliff* and *Jani-King* is the same: "In assessing the true nature of the parties' relationship, courts must look at the practical, not just contractual, realities of the relationship." *Id.* at 80. Importantly, however, the "central question" to the economic realities test is "the worker's economic dependence upon the business for which he is laboring," an inquiry not specifically captured under the ALJ's in-depth analysis nor under our prior caselaw. *Id.* at 74 (citation omitted). The narrowing of enumerated factors, paired with this slight shift in focus, sets the economic realities test apart from previous attempts to distinguish between independent contractors and employees. While not inconsistent with the *Ratliff/Chambers* factors, the economic realities test improves upon their attempts to discern the actuality of the working relationship at issue while streamlining Kentucky's approach to employee/independent contractor designations.

Adopting the economic realities test in the workers' compensation context not only simplifies the definition of independent contractor across the Commonwealth; doing so also serves the purpose of the Workers'

13

Compensation Act itself. In an Opinion clarifying the use of the *Ratliff/Chambers* factors soon after their adoption, the Court of Appeals wrote,

> The theory of compensation legislation is that the cost of all industrial accidents should be borne by the consumer as a part of the cost of the product. It follows that any worker whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it forms in itself a separate route through which his own costs of industrial accident can be channelled [sic], is within the presumptive area of intended protection.

*Husman Snack Foods Co. v. Dillon*, 591 S.W.2d 701, 703 (Ky. App. 1979) (citing Larson, Workmen's Compensation Laws 43.51 (1978)). *Husman* elaborated that to serve the purpose of our workers' compensation statutes, the *Ratliff* factors should be construed with an eye toward whether the alleged employee's work formed the basis of the employer's regular business. *Id.* It makes sense, thus, to develop the law towards a test that more explicitly accounts for the centrality of a worker's dependence on an employer to incur the costs of risks associated with work. Although the *Ratliff/Chambers* factors struggled to achieve this aim, it may be captured within the economic realities test. To reiterate, the "central question" to the economic realities test is "the worker's economic dependence upon the business for which he is laboring." For claimants such as Oufafa who work within ever-complex business schemes, that dependence is an integral part of deciphering whether he was an employee of Taxi 7.

### III. CONCLUSION

This Court did not limit itself when it recently adopted the economic realities test. *Mouanda* acknowledges that the distinction between an employee

14

and independent contractor has broad-ranging consequences: "Designation as an employee or independent contractor determines an individual's entitlement, or lack thereof, to *many statutory employment protections*." *Id.* at 73 (emphasis added). This Court hereby adopts the economic realities test to safeguard the protections afforded by workers' compensation. Accordingly, our holding in *Mouanda* is extended to the workers' compensation context.

Of course, it is outside of this Court's authority to determine whether, under the economic realities test, Oufafa is an employee. Because we adopt a new test for analysis, this Court must remand the case back to the ALJ to develop an analysis on the aforementioned factors. This Court also vacates the ALJ's underlying order. Because we vacate the order in total, AIG's dismissal is ineffectual, and it will remain a party to the case on remand. Further, because of the differences in the tests applied, the ALJ may make any additional or substituted factual findings as required given the new framework for analysis. Given this direction on remand, we need not determine whether the ALJ erred in finding that Taxi 7 is a taxi leasing company, nor need we opine as to the Board's further directions to the ALJ.

All sitting. All concur.

15

COUNSEL FOR APPELLANT:

Andrew Clarke Weeks
Legal Justice at Work PLLC

COUNSEL FOR APPELLEE, TAXI LLC D/B/A TAXI 7 (AKA TAXICAB):

Kyle L. Johnson
Fogle Keller Walker, PLLC

COUNSEL FOR APPELLEE, AIG:

Ronald Jude Pohl
Clarrisa Shirlann Wells
Pohl & Aubrey PSC

COUNSEL  FOR APPELLEE, COMMONWEALTH OF KENTUCKY EX REL.
DANIEL J. CAMEREON, ATTORNEY GENERAL:

Daniel J. Cameron
Attorney General of Kentucky

APPELLEE, W. GREG HARVEY, ADMINISTRATIVE LAW JUDGE

COUNSEL FOR APPELLEE, UNINSURED EMPLOYERS' FUND:

William Henry Jones, III

COUNSEL FOR APPELLEE, WORKERS COMPENSATION BOARD:

Michael W. Alvey
Chairman, Department of Workers' Claims